IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**ALENA NECHELLE VANCE,**                              Civil Case No. 09-711-KI
CAD Drafter/Engineering Technician,

            Plaintiff,                              OPINION AND ORDER

      vs.

**WASHINGTON COUNTY WASTE WATER
TREATMENT FACILITIES, CLEAN WATER
SERVICES,** also known as CWS, **WILLIAM
GAFFI,** Company President,

            Defendants.


      Alena NeChelle Vance
      507 N.E. Cook St.
      Portland, Oregon  97212

            Pro Se Plaintiff


Page 1 - OPINION AND ORDER

Francis T. Barnwell
Maryann Yelnosky
Bullard Smith Jernstedt Wilson
1000 SW Broadway, Suite 1900
Portland , Oregon  97205

      Attorneys for Defendants

KING, Judge:

Pro se plaintiff Alena Vance brought an employment discrimination suit against defendants Clean Water Services ("CWS"), its president, William Gaffi, and Washington County Waste Water Treatment Facilities.  Her complaint, liberally construed, alleges race discrimination and harassment, violations of the Family Medical Leave Act ("FMLA"), and defamation.  Before the court is defendants' Motion for Summary Judgment (#8).  For the following reasons, I grant the motion.

## ALLEGED FACTS

Vance worked for CWS, which provides waste water treatment for the Tualatin River Basin, from November 2001 through December 2007.  Vance, who is African-American, used the AutoCAD software to draft technical drawings for CWS projects.  In December 2005, one of Vance's supervisors hung a piece of paper with a joke on it outside her own door.  The joke read as follows:

> A tourist walked into a pet shop and was looking at the animals on display. While he was there, another customer walked in and said to the shopkeeper, "I'll have a CAD monkey please."  The shopkeeper nodded, went over to a cage at the side of the shop and took out a monkey.  He fitted a collar and leash, handed it to the customer, saying, "That'll be $5000."  The customer paid and walked out with his monkey.  Startled, the tourist went over to the shopkeeper and said, "That was a very expensive monkey.  Most of them are only a few hundred dollars. Why did that one cost so much?"  The Shopkeeper answered, "Ah, that monkey can draw in

CAD - very fast, clear layouts, no mistakes, well worth the money."  The tourist looked at a monkey in another cage.  "That one's even more expensive!  $10,000! What does it do?"  "Oh, that one's a Design monkey; it can design systems, layout projects, mark-up drawings, write specifications, some even calculate. All the really useful stuff," said the shopkeeper.  The tourist looked around for a little longer and saw a third monkey in a cage of its own.  The price tag around its neck read $50,000.  He gasped to the shopkeeper, "That one costs more than all the others put together!  What on earth does it do?"  The shopkeeper replied, "Well, I haven't actually seen it do anything, but it says it's an Engineer."

Pl.'s Resp. Mot. Summ., Ex. A at 14.

Vance believed the joke, and its reference to a monkey that can draw in CAD, was meant to refer to her as an African-American, and was racial harassment.  When Vance complained about the joke, it was removed immediately.  In addition, human resources investigated Vance's complaint about the joke.  Human resources determined the joke was not motivated by racial animus.

In a separate incident, in May 2006, a coworker asked Vance to clean out her locker in the women's changing room because of the smell emanating from it.  When Vance did not do so, the locker was later tied and glued closed.  Vance characterized the tie as a noose and believed it represented racial intimidation.

Beginning in May 2007, Vance began to have a number of other problems at work.  That month, after Vance missed deadlines on a project, CWS issued Vance a Letter of Counseling.  In June 2007, Vance began having attendance problems.  She alerted CWS of her need to take family medical leave due to a serious health condition.  The health condition related to stress, anxiety, back problems, and allergies.  According to Vance, her physical health problems were exacerbated by the stress and anxiety of having to think about the monkey joke.  Although Vance later wrote to her supervisor that she was "allergic to stink [*sic*] of the ignorance of the people in

Page 3 - OPINION AND ORDER

this world," in June 2007 Vance's physician signed the appropriate paperwork to cover a one

week leave under FMLA.  Pl.'s Resp. Mot. Summ., Ex. B at 47.  After the period ended,

however, Vance continued to be absent from work and to arrive late on a regular basis.  Vance

told CWS she needed more medical leave time, but that she could not get the appropriate medical

paperwork because her doctor was on his own leave.  Vance continued to have attendance

problems which were formally documented.  As a disciplinary action for her attendance

problems, in August 2007, she was suspended without pay for two days.  Vance told her union

representative, Greg Baxter, that she believed the disciplinary actions were retaliation for

complaints about the monkey joke and the locker issue.  CWS hired an outside investigator to

review Vance's allegation of retaliation, and found that the allegation was unfounded.

      After months of Vance frequently referencing the monkey joke and the locker "noose" as

a primary source of her problems, on September 5, 2007, Jennifer To, the engineer who

originally hung the monkey joke, wrote Vance a letter of apology about the joke.  But Vance did

not like the tone of the apology and told To she was lucky because if she "had met a less reserved

person she [To] would have been picking herself up off the ground."  Pl.'s Resp. Mot. Summ.,

Ex. B at 51.  To filed a complaint against Vance following the conversation, and CWS issued

Vance a letter of counseling about the incident.

      During the same month, Vance submitted medical documentation sufficient to allow

occasional medical leave due to her back problems and allergies.  In response, CWS issued

Vance instructions about the protocol for informing her supervisor when she intended to use

medical leave, about the hours she was expected to be present otherwise, and about the protocol

for informing her supervisor when and why she would be late.

Page 4 - OPINION AND ORDER

Vance continued, however, to have absence and tardiness problems not covered by her medical leave throughout September and October 2007.  In late October 2007, CWS placed Vance on paid administrative leave while it evaluated whether to terminate her employment. When this happened, Vance told supervisors they "had better watch [them]selves," and that they were "evil" and "racist."  Pl.'s Resp. Mot. Summ., Ex. B at 75.  CWS wrote a letter to Vance counseling against making such remarks.

In November 2007, Vance filed a grievance about the monkey joke with her union, Teamsters Local 223.  Under the collective bargaining agreement, however, the grievance was untimely.

On November 30, 2007, Vance was again placed on paid administrative leave for a confrontation between Vance and one of her supervisors that occurred two days earlier.  The same day, Vance's union representative, Greg Baxter, became aware that Vance was likely to be terminated.  After conferring with Vance, Baxter negotiated with CWS a payment in exchange for Vance's resignation and release of all claims.  On December 11, 2007, Baxter left a draft of the proposed Release and Settlement Agreement ("Release") at Vance's residence.  She subsequently called Baxter to inform him she would sign the Release.  The two met at a coffee shop on December 12, 2007, and Vance and Baxter signed the Release.  Baxter then returned the document to CWS and a company representative signed it the same day.  In exchange for signing the Release, CWS paid Vance $10,000.  The Release read, in part,

> In exchange for good and valuable consideration, the form and sufficiency of
> which is hereby agreed and acknowledged, Vance . . . hereby forever releases,
> waives, and discharges CWS, including its directors, officers, agents, employees,
> insurers, attorneys and assigns, from and against any and all claims, demands and
> causes of action . . . of every kind and nature whatsoever, which Vance has or had

against CWS, arising out of any act or matter occurring on or before the date this Agreement is executed.

Decl. Victor Nolan, Ex. B at 1.

The Release, however, did not put an end to Vance's contact with CWS employees.  On February 26, 2008, CWS president, defendant William Gaffi filed a Petition for Stalking Protective Order.  The order, which was granted, detailed that Vance had called Gaffi and stated that "you are being threatened and I know where you live."  Nolan Decl., Ex. D at 2.  Vance was angry that Gaffi had not raised money to pay Vance's mortgage.  She stated that if she lost her home she was "going to go vigilante on y'all."  Id. at 3.  On a separate occasion, Vance called Gaffi's wife and made threats about "showing up at [her] house."  Id. at 2.

In response to the threats, CWS and Gaffi spent $170,000 on security services, bought firearms, and installed security systems.  CWS also consulted with experts on workplace violence, who advised the company to take Vance's threats seriously.  The advice was based on the foregoing facts, as well as Vance's apparently unrelated arrests for possession of tear gas, stun guns, and violations of other stalking orders.  Id. at 7.  On April 3, 2009, the stalking order was made final.

During the same post-employment period, Vance alleges that potential new employers were unable to get positive references about her from CWS.  According to Vance, CWS employees were instructed to hang up on her or anyone who mentioned her name.  According to CWS, the information it gives to potential employers regarding past employees, including Vance, is strictly limited to dates of employment, and the company complied with that obligation.

Page 6 - OPINION AND ORDER

**STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the court draws all reasonable inferences in favor of the non-moving party. If there are disputed issues of material fact, the court assumes the version of material fact asserted by the non-moving party. Bryan v. McPherson, 590 F.3d 767, 772 (9th Cir. 2009).

**DISCUSSION**

Vance's claims are barred by the Release and Settlement Agreement she signed on December 12, 2007.

Courts in the Ninth Circuit rely on local contract law to interpret release and settlement agreements. See Jeff D. v. Andrus, 899 F.2d 753, 759 (9th Cir. 1989). A release is a contract in which one or more parties agree to abandon claims or rights. Lindgren v. Berg, 307 Or. 659, 665, 772 P.2d 1336 (1989). If the terms of the release unambiguously express the intent of the parties, the release must be enforced accordingly. Patterson v. Am. Med. Systems, 141 Or. App. 50, 53, 916 P.2d 881 (1996). The rule is that an honest release, untainted by unconscionable conduct, cannot be set aside because it was improvident. Walcutt v. Inform Graphics, Inc., 109 Or. App. 148, 151, 817 P.2d 1353 (1991). Releases and settlements are favored by the law, and

are not rendered unenforceable either by ordinary mistakes or negligent mistakes in the parties' knowledge and understandings when they enter into them.  Id.

Rather, a release agreement is subject to construction and interpretation like any other contract.  Ristau v. Wescold, Inc., 318 Or. 383, 387, 868 P.2d 1331 (1994).  "Oregon subscribes to the objective theory of contracts. In determining whether a contract exists and what its terms are, we examine the parties' objective manifestations of intent, as evidenced by their communications and acts."  Dalton v. Robert Jahn Corp., 209 Or. App. 120, 132, 146 P.3d 399 (2006).  "Whether parties enter into a contract does not depend on their uncommunicated subjective understanding; rather, it depends on whether the parties manifest assent to the same express terms."  Id.  "In the absence of an ambiguity, the court construes the words of a contract as a matter of law."  Yogman v. Parrott, 325 Or. 358, 361, 937 P.2d 1019 (1997).  "In a contract dispute, a party will be entitled to summary judgment only if the governing terms of the contract are unambiguous."  Wihtol v. Lynn, 209 Or. App. 56, 63, 146 P.3d 365 (1996).

In this case, the terms of the settlement agreement are unambiguous.  The agreement provides, "[i]n exchange for good and valuable consideration, the form and sufficiency of which is hereby agreed and acknowledged, Vance . . . hereby forever releases, waives, and discharges CWS, including its directors, officers, agents, [and] employees . . . from and against any and all claims, demands and causes of action . . . of every kind and nature whatsoever[.]"  Nolan Decl., Ex. B at 1.  Vance accepted payment of $10,000 in exchange for giving up her claims against defendants.  Although Vance contends she never read the settlement agreement, immediately above her signature on the document it reads, in bold, block print, "CAUTION: THIS IS A RELEASE.  READ IT BEFORE SIGNING."  Id. at 3.  Moreover, in the absence of fraud, it is

Page 8 - OPINION AND ORDER

not a valid defense to enforcement of a written contract for a party to say they had no knowledge

of its contents.  <u>Kight v. Orchard-Hays</u>, 128 Or. 668, 672, 275 P. 682 (1929).

I need not reach the merits of Vance's claims because they are all barred by the Release.

The language of the Release unambiguously covers claims for race discrimination and

harassment, violations of FMLA, and defamation.

## CONCLUSION

Therefore, there is no issue of material fact that, as a matter of law, Vance is barred from

bringing the instant suit.  Accordingly, defendants' Motion for Summary Judgment (#8) is

granted.

IT IS SO ORDERED.

Dated this _____9th_____ day of February, 2010.


_/s/ Garr M. King_____
Garr M. King
United States District Judge